UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
:
SAINT SURIN EDUOARD,                                       :
:
                               Plaintiff,    :   **FINDINGS OF FACT AND**
:   **CONCLUSIONS OF LAW**
       -against-                                          :
:   18-cv-05554 (BMC)
NIKODEMO OPERATING CORP. d/b/a                             :
FLORIDIAN DINER, DIMITRIOS KALOIDIS,                       :
IOANIS PARAPONIARIS, and STEVE                             :
ZAHARAKIS,                                                 :
:
                              Defendants.   :
---------------------------------------------------------- X

**COGAN**, District Judge.

        Plaintiff brings this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*., and the New York Labor Law ("NYLL"), §§ 650 *et seq*, as amended by the Wage Theft Prevention Act ("WTPA"), NYLL § 195(3). He argues defendants underpaid him, and therefore, his weekly wage statements were inaccurate and incomplete. He also alleges defendants retaliated against him after he complained about their unfair wage practices. Conversely, defendants contend that their deduction and rounding policies were lawful and that they fired plaintiff for non-retaliatory reasons.

        This case was tried to the Court. The following decision constitutes the Court's findings of facts and conclusions of law, drawn from witness testimony at trial and the parties' trial exhibits, pursuant to Federal Rule of Civil Procedure Rule 52(a).

        To summarize, plaintiff failed to prove that defendants' business is a covered enterprise or that he is a covered employee under the FLSA. His FLSA claims are therefore dismissed. As to his claims under the NYLL, he failed to prove that defendants' rounding and deduction practices deprived him of any unpaid wage or additional overtime pay. However, plaintiff did

prove that defendants deprived him "spread of hours" wages under N.Y. Com. Codes R. & Regs. Tit 12, § 142-2.4. Therefore, plaintiff is entitled to statutory damages for subsequent WTPA violations because his weekly wage statements were not accurate.

## FINDINGS OF FACT

From June 2013 to February 2018, plaintiff was employed at defendants' diner in Brooklyn, New York. The time period in dispute pertains to plaintiff's employment from December 15, 2016 to February 1, 2018. Although plaintiff was primarily a dishwasher, his duties also included mopping and sweeping, peeling potatoes, and retrieving supplies from the basement. Plaintiff worked the night shift, working every day of the week, except Thursdays.

The actual times of when plaintiff came to the diner and left the diner are not in dispute. Every time he came into and left work, plaintiff would document his hours by inserting his time card into a time punch machine that recorded the hours plaintiff worked, including an unpaid meal break. When computing the total hours an employee worked in one day, defendants would consistently deduct one hour from each day's total to indicate the unpaid meal break.

Plaintiff filed a complaint with the New York Department of Labor in June 2015. In March of 2016, two other employees of the diner filed a class and collective action, Ramos v. Nikodemo Operating Corp., 16-cv-1052 (E.D.N.Y. March 2, 2016), in this court, raising similar claims to those plaintiff has raised here. On December 30, 2016, Magistrate Judge Orenstein recommended approval of a class-wide settlement, and on August 7, 2017, following a fairness hearing, Judge Matsumoto approved the class-wide settlement. Plaintiff received $34,460.30 as his share of this class/collective settlement.

After the settlement, plaintiff, along with almost every other employee who received compensation under the settlement, continued to work for defendants. There is no indication that

defendants took any reprisals against the employees who had instigated and participated in the Ramos action, other than plaintiff's allegations here.

In 2017, plaintiff's pay increased to $11 an hour, the minimum wage in New York at the time. From December 2016 to February 2018, defendants provided plaintiff with weekly wage statements that accurately reflected the total hours he worked. These wage statement also accounted every hour plaintiff worked, including required overtime pay whenever he worked over 40 hours a week. But plaintiff's weekly wage statements failed to factor in additional compensation owed to him when the beginning and ending of his work day spanned more than ten hours, including his unpaid meal break.

Defendant Paraponiaris, the only defendant to testify at trial, co-owns the diner. Based on his position, Paraponiaris had the authority to give employees more money and would pay his employees more money if they notified Paraponiaris they were not able to take a meal break. Despite knowing this and being told an hour was being deducted from his daily pay, plaintiff neither asked anyone at the diner for more money, nor did he ever tell anyone at the diner that he did not have time to take his meal break.

Because Paraponiaris worked the night shift every other month, he had the opportunity to regularly observe plaintiff's work performance and was not impressed. On several occasions, he had to warn plaintiff for talking on a cellphone at work. He also regularly saw plaintiff eating meals at the diner, which every employee was encouraged to do, as outside food was not allowed. But on one particular occasion, Paraponiaris caught plaintiff eating shrimp. This was not allowed because shrimp was expensive. Plaintiff was also frequently very slow in beginning his duties: he would buy a soda from the vending machine; he would take his time getting ready;

he would say "hello" to his friends and chat; he would go to the basement and change his clothes (even though he was not required to); and only then would he begin his work duties.

There came a point in late 2017 when defendants needed to cut additional employees and decrease payroll, mostly as a result of increases in the minimum wage required by New York City law.  Initially, rather than cut staff, Paraponiaris decreased his employees' hours, including plaintiff's hours.  But the minimum wage was still going up annually and the diner was struggling financially.  When it therefore became necessary to let go another employee, Paraponiaris selected plaintiff because he was the least effective dish-washer, and plaintiff had multiple infractions, including an incident where he refused to clean the bakery, telling Paraponiaris's partner that "it's not my job." Paraponiaris did not learn of this incident from his partner until two or three months after it occurred. But it particularly upset Paraponiaris, who would have fired plaintiff on the spot had he known of the incident at the time.

In addition to the Court's close review of the documentary evidence, the Court carefully weighed the competing parties' respective credibility. Paraponiaris was much more credible than plaintiff on several issues.

On the issue of whether plaintiff regularly took a meal break, I discredit plaintiff's testimony for multiple reasons.  First, plaintiff's testimony was implausible.  Plaintiff testified that he was constantly busy his entire shift to the point where he was never able to sit down or eat at the diner from December 2016 to February 2018.  "[N]ever once, from December 16, 2016 until the last day you worked, could you ever sit down while working?"  Plaintiff reaffirmed, "No, I [didn't] sit down."

But Paraponiaris's testimony was clear that of course all employees sit down, take breaks, and eat meals, which he encourages them to do (as long as they're not dining on

premium items like shrimp and lobster). There were pictures received into evidence of employees with all different jobs at the diner, including plaintiff's job, eating during a slow period and looking quite happy about it too. Indeed, among those dining employees were at least one of the employees who had previously commenced the Ramos collective/class action.

At the conclusion of his testimony, I inquired of plaintiff whether he ever got hungry during his shift, and he said "no." I can't accept that as a truthful answer. It's just not normal to work that so many hours in a diner over so substantial a period and not get hungry on even one shift. It is also contrary to the unrebutted testimony that on least one occasion, plaintiff brought his own ethnic food, cooked, and ate it. Paraponiaris reprimanded him since outside food was not allowed, but hetold him to help himself to non-premium diner food instead.

Plaintiff also testified that when he confronted Paraponiaris about having an hour deducted from time sheets, Paraponiaris told him that plaintiff was not being paid for lunch. I asked plaintiff whether he responded to Paraponiaris by saying something like, "well, ok, then I'm going to take an hour off for lunch." Plaintiff testified that he did not, but instead continued to work through the lunch hour even though he knew, at least from that point, that he would not be paid. That is simply not credible.

Secondly, plaintiff's testimony of his inability to take a break was disingenuous. Most people in his shoes would have complained to someone, especially if time was regularly deducted for an alleged "phantom" break. Although I recognize some employees may rightly have reservations about voicing their concerns to their employers, plaintiff would have spoken out if his allegations were true: he had previously received a substantial settlement from this same employer for unfair labor practices in late 2016, and even conceded on cross-examination that "if [defendants] have to pay you more, they'll just pay you more."

In sum, he had every reason to speak up. Plaintiff's actions in filing an official complaint with the Department of Labor of unfair labor practices in June 2016, yet allegedly remaining silent, from December 2016 to January 2018, about an arguably more egregious workplace condition, are inconsistent.

Thirdly, plaintiff was impeached at trial through his prior inconsistent statement from his sworn deposition. Although plaintiff testified at trial that he spoke with fellow workers how he could not take breaks, he stated in his deposition that he did not speak to anyone about the issue.

## CONCLUSIONS OF LAW

At trial, plaintiff pursued each of the causes of action listed in his complaint:

(1) Violation of the overtime provisions of the FLSA.

(2) Violation of overtime wage provision of the NYLL and accompanying regulations.

(3) Failure to pay "spread of hours" wages in violation of the NYLL.

(4) Failure to pay earned wages in violation of the NYLL.

(5) Failure to provide wage statements in violation of NYLL § 195(3); and

(6) Retaliation in violation of the NYLL.

### I.     Jurisdiction and Venue

This Court has original subject matter jurisdiction over this action because it arises under the FLSA, a federal statute. See 28 U.S.C. § 1331. It also has supplemental jurisdiction over plaintiff's state-law claims. See 28 U.S.C. § 1367. Venue is proper because the underlying actions occurred at defendants' diner in Brooklyn, NY. See 28 U.S.C. § 1391.

### II.    Burden of Proof

Plaintiff bears the burden of proof to establish all claims and damages by a preponderance of the evidence. See, e.g., Solis v. SCA Rest. Corp., 938 F. Supp. 2d 380, 392 (E.D.N.Y. 2013).

### III. FLSA Coverage

The FLSA covers any employee "who in any work-work is engaged in commerce or in the production of goods for commerce," or "is employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a), 207(a)(1). "The two categories are commonly referred to as 'individual' and 'enterprise' coverage, respectively." Jacobs v. New York Foundling Hosp., 577 F.3d 93, 96 (2d Cir. 2009).

Under the first category, "an employee is engaged in commerce under the meaning of the statue if the work is so directly and vitally important to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than an isolated local activity." Jiao, 2007 WL 4944767, at *8 (employee "engaged in commerce" when his duties included taking reservations on a regular basis, including from guests traveling out-of-state as well as outside the country). Conversely, activities that simply "affect or indirectly relate to interstate commerce" are insufficient. McLeod v. Threlkeld, 319 U.S. 491, 497 (1943). The work that directly involves interstate commerce must make up a "substantial part" of the employee's overall employment activities. Boekemeier v. Fourth Universalist Soc'y in the City of New York, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) ("[R]ecurrent and frequent purchases of goods from out-of-state vendors is more than sufficient to trigger the protection of the FLSA."). As a basic rule, "if plaintiff did not have any contact with out-of-state customers or businesses, he cannot be individually covered under the FLSA." Ethelberth v. Choice Sec. Co., 91 F. Supp. 3d 339, 354 (E.D.N.Y. 2015) (plaintiff failed to satisfy individual coverage when he merely guarded over items that were made outside of New York).

Relying on an argument the court in Ethelberth rejected, plaintiff claimed he was individually covered because he regularly handled cleaning products and peeled potatoes that

were "likely" transported through interstate commerce. This evidence is insufficient to satisfy the requirements for individual coverage under the FLSA. There was no evidence that plaintiff's duties involved the production of goods "among the several States or between any State and any place thereof." Plaintiff neither ordered cleaning supplies nor equipment for the diner from out-of-state vendors by telephone or internet. And there was no evidence that he received shipments across state lines. Contrary to plaintiff's assertion, the mere fact that he may have regularly handled cleaning supplies or perishable products that originated outside of New York does not satisfy individual coverage under the FLSA. See McLeod, 319 U.S. at 494 ("[E]mployees who handle goods after acquisition by a merchant for general local disposition are not [engaged in commerce]."; Walker v. Interfaith Nutrition Network Inc., 14-cv-5419, 2015 WL 4276174, at *4 (E.D.N.Y. July 14, 2015) (holding that using material that originated out-of-state insufficient to sustain a claim based on individual coverage).

An "enterprise engaged in commerce" is an enterprise: (1) that "has employees handling, selling, or otherwise working on goods or materials that have moved in or produced for commerce" and (2) "whose annual gross volume of sales made or business done is not less than $500,000." Hernandez v. JRPAC Inc., 14-cv-4176, 2016 WL 3248493, at *20 (S.D.N.Y. June 9, 2016) (citing 29 U.S.C. § 203(s)(1)). A plaintiff has the burden to prove both steps to establish enterprise coverage. Jacobs, 577 F.3d at 99 n.7.

Plaintiff satisfied the first step because the cleaning supplies and potatoes he handled probably moved in interstate commerce. See D'Arpa v. Runway Towing Corp., 12-cv-1120, 2013 WL 3010810, at *13 (E.D.N.Y. June 18, 2013). Here, as was the case in D'Arpa, "it is inconceivable that none of the [goods or materials] used by plaintiff in [his] line of work originated outside of New York." Id.

However, the second step of the enterprise test requires plaintiff to produce evidence at trial that defendants' annual gross sale volume exceeded $500,000. Hernandez, 2016 WL 3248493, at *21 (holding against the plaintiff when no evidence was introduced at trial of defendant's annual sales volume, let alone that its annual sales exceeded $500,000); Mauricio Ramirez v. Roka Japanese Food, Inc., 18-cv-296, 2019 WL 2372866, at *5 (E.D.N.Y. June 5, 2019) (holding plaintiff failed to meet his burden for relief under the FLSA claim when he failed to present any evidence of gross-volume). By failing to introduce any evidence of the diner's annual sales volume from 2013 to 2016, let alone that its annual gross sales exceeded $500,000, plaintiff did not satisfy the second step of the enterprise coverage test. The FLSA claim is therefore dismissed.

### IV.     Earned Wages and Overtime Under the NYLL[1]

Plaintiff also alleges violations of unpaid wages and overtime laws. NYLL §§ 191(1)(a), 652(1). Under the NYLL, earned wages must be paid within seven days. § 191(1)(a). Federal law requires that employees covered by the FLSA who work longer than 40 hours in a given week be paid 1½ times "the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). The NYLL incorporates this federal overtime requirement by reference. 12 N.Y.C.R.R. § 142-2.2. "[The NYLL] mirrors the FLSA in compensation provisions regarding minimum hourly wages and overtime." Santillan v. Henao, 822 F. Supp. 2d 284, 292 (E.D.N.Y. 2011). Under the NYLL, "all of the time worked during a continuous workday is compensable, save for *bona fide* meal breaks." Hart v. Rick's Cabaret Int'l, Inc., 60 F. Supp. 3d, 447, 475 n.15 (S.D.N.Y. 2014). Defendants paid plaintiff whenever he worked overtime, and the plaintiff did not carry his burden that he was deprived of any unpaid wages.

---

[1] Since I've already tried the case, I am exercising supplemental jurisdiction over plaintiff's state law claims. See 28 U.S.C. § 1367.

## V. Rounding Under the NYLL

Defendants had a policy of rounding up or down plaintiff's starting or ending times to the nearest whole hour when computing his weekly total hours. Plaintiff alleges this practice deprived him of earned wages under the NYLL. But "[r]ounding practices are not *per se* unlawful." Burns v. Haven Manor Health Care Ctr., LLC, 13-cv-5610, 2015 WL 1034881, at *1 n.2 (E.D.N.Y. March 10, 2015) (citation omitted). FLSA regulations regarding the use of time clocks and rounding state that "where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work." 29 C.F.R. § 785.48(a). Consequently, "rounding policies that on average, favor neither overpayment nor underpayment of wages are permissible, while those that systematically undercompensate employees are unlawful." Boone v. PrimeFlight Aviation Servs. Inc., 15-cv-6077, 2018 WL 1189338, at *5 (E.D.N.Y. Feb. 20, 2018). Also, "[r]ounding is commonly accepted in industry at intervals ranging from five to fifteen minutes." Vasquez v. Victor's Café 52nd Street Inc., 18-cv-10844, 2019 WL 4688698, at *4 (S.D.N.Y. Sept. 26, 2019) (citation omitted).

Plaintiff failed to prove that defendants' rounding policy "systematically undercompensated" him. Although he introduced his timesheets, he never called a summary expert to total them, nor did he submit a chart or calculation of the total amount he allegedly lost. Also, defendant Paraponiaris testified plaintiff was "very slow" in starting work, even after "punching in" his time card. Plaintiff is not entitled to the time he spent completing unnecessary tasks.

Defendants' rounding practice applied equally to all defendants' employees and worked both to the benefit and detriment of its employees. It was neutral on its face and in its application. Plaintiff did not introduce any evidence that there was a disciplinary policy for employees who clocked in late. In fact, plaintiff at times arrived late to work, without facing any disciplinary action. On these occasions, despite arriving late to work, his time was still rounded down to the nearest whole hour, benefitting him on at least some occasions. Similarly, whenever plaintiff would leave work early by a few minutes, defendants consistently rounded up the time, benefiting him once again.

Defendants' rounding policy was permissible because any alleged undercompensation was a *de minimis* amount. See Corbin v. Time Warner Entertainment, 821 F.3d 1069, 1079 (9th Cir. 2016) (holding rounding policy neutral as applied where the plaintiff was undercompensated by $15.02 over thirteen months); Boone, 2018 WL 1189338, at *8-9 (holding a rounding policy neutral as applied where the plaintiff was undercompensated by $82.17 over twenty-six months).

### VI.     Spread of Hours Compensation

Plaintiff also brings a "spread of hours" claim against defendants under the NYLL. The NYLL "spread of hours law" provides that "[a]n employee shall receive one hour's pay at the basic minimum hourly wage, in addition to the minimum wage required … for any day in which: … the spread of hours exceed [ten] hours." 12 N.Y.C.R.R. § 142-2.4. The measure of the workday for this purpose is the number of hours from the time the employee starts his work until he finishes, including work time, non-working time, and even intervals off duty. Yu G. Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 260 (S.D.N.Y. 2008).

In 2017, this law covered plaintiff because his hourly wage did not exceed the state's minimum wage of $11. The evidence introduced at trial showed 17 instances where plaintiff's

Page **11** of **15**

workday, including the unpaid hourlong break, was longer than 10 hours.[2] According to plaintiff's earning records, although he was paid for each hour he worked, including overtime, he did not receive an additional hour's pay at the minimum hourly wage for days he worked more than 10 hours. Plaintiff has satisfied his burden for this claim and is awarded $187 for unpaid "spread of hours" wages.

### VII. Liquidated Damages

The NYLL provides for liquidated damages for wage-claim violations, and the burden shifts to the employer to prove good faith and reasonableness. Galeana v. Lemongrass on Broadway Corp., 120 F. Supp. 3d 306, 317 (S.D.N.Y. 2014). If the employer fails to meet his burden of demonstrating good faith and reasonableness in ensuring compliance with the NYLL, an employee is entitled to recover, not only his unpaid wages, but additional liquidated damages in an amount equal to the unpaid wages. Id. Liquidated damages are also available for "spread of hours" violations. Haifeng Xie v. Sakura Kai I Inc., 17-cv-7509, 2019 WL 1568756, at *7 (E.D.N.Y. April 11, 2019).

Here, defendants have not met their "difficult burden" of proving good faith when they failed to pay plaintiff an additional hour of minimum wage on days he worked more than 10 hours. See Reich v. S. New Eng. Telecomms. Corp., 121 F.3d 58, 71 (2d Cir. 1997). Plaintiff is therefore entitled to both liquidated damages and unpaid "spread of hours" wages that totals $374. See id. ("[D]ouble damage are the norm, single damages the exception[.]") (citation omitted).

---

[2] Plaintiff Exhibit A shows the following 17 instances: (1) during the week of February 19, 2017, plaintiff worked a shift lasting 12 hours; (2) during the week of May 28, 2017, he worked 2 shifts of 13 hours each; (3) during the weeks of October 8, 2017 and October 22, 2017, he worked an 11 hour and 14 hour shift, respectively; (4) during the week of December 24, 2017, he worked an 11 hour shift; and (5) during the week of December 31, 2017, he worked a 13 hour shift. The same exhibit shows 10 additional instances where plaintiff worked shifts of more than 10 hours, but defendant rounded down to 9 hours.

### VIII. Wage Statements Under the NYLL § 195(3)

The Wage Theft Prevention Act ("WTPA") requires employers to "furnish each employee with a statement with every payment of wages that list various categories of information." NYLL § 195(3). The employer must provide an employee, at every payment of wages, a statement listing the following information: the dates of work covered by the payment; name of the employee; name of the employer; address and phone number of the employer; rate or rates of pay and basis thereof; whether paid by the hour or shift; other gross wages; and net wages. Haifeng Xie, 2019 WL 1568756, at *9 (citation omitted). If a violation occurs, an employee may seek statutory damages of $250 for each payment date[3] the violation occurred, but no more than $5,000, "together with costs and reasonable attorney fees." § 198(1-d). To avoid liability, a defendant may raise the affirmative defense that he made complete and timely payment of all wages due. See Caltenco v. G.H. Food Inc., 16-cv-1705, 2019 WL 4784065, at *11 (E.D.N.Y. Sept. 30, 2019) (citation omitted).

Plaintiff contends the WTPA requires not just the furnishing of wage statements with the delineated categories of information, but wage statements that accurately reflect total compensation due to the employee. The WTPA requires an employer to provide their employees with wage statements that includes gross and net wages. A substantiated "spread of hours" violation can form the basis of a WTPA violation as well. See Eren v. Gullouglu LLC, 15-cv-

---

[3] Although the statute states an employee is entitled to $250 per "work day" a violation occurs, "it is obvious that the intent of the statute was to only count days where wages are actually paid, and not to count work days in between pay periods." Haifeng Xie, 2019 WL 1568756, at *9 n.8 (citing Draskovic v. Oneota Associates, LLC, 17-cv-5085, 2019 WL 783033 (E.D.N.Y. Feb. 21, 2019)).

4083, 2017 WL 9482104, at *4 (E.D.N.Y. May 10, 2017) (recommending denial of defendants' motion for summary judgment for WTPA claim when they failed to show it complied with the "spread of hours" law).

Defendants provided plaintiff with deficient weekly wage statements on 12 occasions from December 2016 through February 2018, and thus, he is entitled to statutory damages of $250 per violation for a total of $3,000.

### IX. Retaliatory Termination

Plaintiff finally claims he was fired for complaining about defendants' "unlawful" wage payment practices. Under the NYLL, "[n]o employer … shall discharge … or retaliate against any employee because such employee has made a complaint to his or her employer … [] regarding a NYLL violation." § 215(1)(a). It is the "plaintiff's affirmative burden to demonstrate that he was retaliated against in violation of the NYLL." Haifeng Xie, 2019 WL 1568756, at *11. To establish a *prima facie* case of retaliation, plaintiff must show that he: (1) participated in protected activity known to defendants; (2) subsequent adverse employment action; and (3) a causal connection between the protected activity and his adverse employment action. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). "Once plaintiff establishes a *prima facie* case of [] retaliation, the burden shifts to defendant to articulate a legitimate, [non-retaliatory] reason for the employment action." Mullins v. City of N.Y., 626 F.3d 47, 53 (2d Cir. 2010) (internal quotation marks and citation omitted).

Based on the evidence presented at trial, and my credibility determinations of the witnesses, plaintiff failed to demonstrate that defendants retaliated against him. There is insufficient evidence of a causal connection between any alleged protected communication and his subsequent termination. And even assuming plaintiff established a *prima facie* case of

retaliation, defendants articulated legitimate, non-retaliation reasons for terminating plaintiff. Therefore, the defendants prevail on this retaliation claim.

### X.     Prejudgment Interest

Based on defendants' "spread of hours" violation, plaintiff is entitled to prejudgment interest on his unpaid compensation. See NYLL § 198(1-a). This interest accrues only on his actual damages and not on his liquidated damages. See Gamero, 272 F. Supp. 3d at 515. But he is not entitled to prejudgment interest on statutory damages for violations of NYLL § 195(3). Id. In computing prejudgment interest, I apply a rate of 9% per annum. N.Y. Civ. Prac. L & R. 5001.

While some courts often choose the midpoint of a plaintiff's employment in computing prejudgment interest, a court may fashion its own remedy in unique circumstances to avoid overcompensating a plaintiff. See Haifeng Xie, 2019 WL 1568756, at *11 (holding the appropriate accrual date was the mid-point between the date of the first violation and plaintiff's last day at work). In this case, the first "spread of hours" violation occurred on February 25, 2016, and plaintiff's last day working for defendants was February 1, 2018. Therefore, the approximate mid-point between these two dates is February 12, 2017, and plaintiff is entitled to $45.32 in prejudgment interest.[4]

### **CONCLUSION**

The Clerk is directed to enter judgment in favor of plaintiff for $3,419.32.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       October 22, 2019

---

[4] $187.00 x (983 days ÷ 365 dates in a year) x .09% (rate of interest) = $45.32.